# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David W. McKeague | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 1141 | **DATE** | 12/1/2000 |
| **CASE TITLE** | Dunkin Donuts,etal vs. Donuts, Inc.,etal | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion: Plaintiffs' motion for summary judgment on their claims (99-1) is granted in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 06 2000 | |
| | Notified counsel by telephone. | | date docketed | 148 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/5/2000 | |
| GL | courtroom deputy's initials | FILED FOR DOCKETING  00 DEC -6  AM 8: 37 | date mailed notice  GL | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DUNKIN' DONUTS INC., a Delaware
Corporation, and THIRD DUNKIN'
DONUTS REALTY, INC., a
Massachusetts Corporation,

     Plaintiffs,

                      Case No. 99-CV-1141

v.                    HON. DAVID W. McKEAGUE

DONUTS, INC., an Illinois
Corporation, J.P. DONUTS,
INC., an Illinois Corporation,
and DIPAK N. BHAYANI,

     Defendants.

_____/

## MEMORANDUM OPINION

Plaintiff Dunkin' Donuts Inc. and Third Dunkin' Donuts Realty, Inc. ("Dunkin") are corporations with their principal places of business in Randolph, Massachusetts. Defendant Donuts, Inc. and J.P. Donuts, Inc., are Illinois corporations with their principle places of business in Homewood, Illinois, and Harvey, Illinois, respectively. Both defendant corporations are Dunkin franchisees. Defendant Dipak N. Bhayani is the sole shareholder of Donuts, Inc. and J.P. Donuts, Inc.[1]

---

[1] The parties refer to defendants simply as "Bhayani." That usage is continued here.

Dunkin filed this action against defendants for breach of contract, trademark infringement, trade dress infringement, unfair competition, and trademark dilution. Defendants filed a counterclaim, asserting breach of contract, breach of the implied covenant of good faith and fair dealing, breach of Illinois Franchise Disclosure Act, and intentional and negligent misrepresentation and omissions. Both parties seek declaratory judgment, damages, and injunctive relief.

On June 30, 2000, Dunkin filed a motion for summary judgment on its own claims as well as a motion for summary judgment on defendants' claims. Defendants responded, and Dunkin submitted reply briefs. A hearing on the motions was held on September 19, 2000.

## I. <u>FACTUAL BACKGROUND</u>

Dunkin is the franchisor of the "Dunkin' Donuts" franchise system. Dunkin has the exclusive license to use and license others to use its trademarks, service marks, and trade name. These marks and trade name have been used continuously since 1960 to identify Dunkin's doughnut shops as well as the doughnuts, pastries, coffee, and other products associated with those shops.

Bhayani purchased a Dunkin' Donuts franchise in Homewood, Illinois in 1980. He subleases the Homewood store building from

2

Third Dunkin' Donuts Realty, Inc. Bhayani also opened a Dunkin franchise in Harvey, Illinois in 1994. Unlike the Homewood store, defendant purchased and currently owns the Harvey store building. The Franchise Agreements entered into by the parties licensed Bhayani to operate doughnut shops at the Homewood and Harvey locations utilizing Dunkin's marks and trade name.

## A. FINANCIAL OBLIGATIONS
## UNDER THE AGREEMENTS AND SUBLEASE

Under the franchise agreements, Bhayani agreed to pay a franchise fee of 4.9 percent of gross sales to Dunkin and an advertising fee of five percent of gross sales to the Franchise Owners Advertising and Sales promotion fund. Franchise Agreements ¶¶ 4.E,4.F. Under the sublease, Bhayani is required to pay fixed rent and percentage rent on a monthly basis. Sublease ¶¶ 3(a),3(b). Failure of Bhayani to make payments when due constitutes a material default under the Franchise Agreements and sublease, which if not cured within the specified time frame, provides cause for termination of the Agreements and/or sublease.

Further, under the Franchise Agreement for the Homewood shop, if the sublease for that location is terminated, the Homewood Franchise Agreement may also be terminated without an opportunity to cure. Franchise Agreement ¶ 9.B.4. Likewise, if

3

the Homewood Franchise is terminated, the sublease for the building may also be terminated. Sublease ¶ 6.

Bhayani has fallen behind on financial payments on numerous occasions. Dunkin has sent notices of default and notices to cure relating to these failures to make timely payments. As of January 4, 1999, Dunkin contends that Bhayani owed $12,744.20 in delinquent fees for the Homewood shop; $14,946.16 in delinquent rent and tax escrow payments for the Homewood shop building; and $5,499.02 in delinquent fees for the Harvey shop. Plaintiffs' Rule 56.1 Statement ¶¶ 37-39. Defendant allegedly failed to cure the financial defaults, and, accordingly, Dunkin served Notices of Termination on February 5, 1999, informing Bhayani that his Franchise Agreements and sublease were terminated. Dunkin's demands that Bhayani vacate the building and cease operation as Dunkin' Donuts shops have gone unheeded. As of June 26, 2000, Bhayani's financial delinquencies have allegedly grown to $180,657.23 under the Homewood shop Franchise Agreement and sublease and $29,005.32 under the Harvey Franchise Agreement. *Id.* ¶ 47.

Bhayani concedes that he has failed to make timely payments to Dunkin on several occasions. Bhayani Aff. ¶ 107. He asserts, however, that he paid the rents due under the sublease in a timely manner, and provides copies of deposited checks in

4

support. *See* Defendants' Exh. F.4. He acknowledges being delinquent on franchise and advertising fees owed to Dunkin, but maintains that because of Dunkin's unwillingness to support a branded products program, he faced "severe financial losses, including lost sales and lost profits," forcing him "to sell off assets, mortgage real estate and issue promissory notes" to meet his obligations. Bhayani Aff. ¶ 63. The resulting cash flow strain was allegedly "a direct cause of the problems for which Dunkin now seeks to terminate [his] franchise agreements." *Id.* Bhayani also argues that Dunkin failed to make capital improvements to the Homewood building, requiring him to pay $35,759 on various repairs, further reducing his cash flow. *Id.* ¶ 29.

## B. <u>HEALTH, SANITATION, AND SAFETY STANDARDS OF DUNKIN</u>

Pursuant to the Franchise Agreements, Dunkin provided Bhayani with a set of manuals and guidelines which set forth the procedures, methodology, and standards applicable to the operation of a Dunkin' Donuts shop. These included the Network Administration Manual, the Production and Distribution Manual, the Customer Service Manual, and the Retail Food Safety System Manual. Second Amended Complaint ¶¶ 19-20. Dunkin contends that together, these manuals provide detailed and specific guidance

and standards for shop maintenance and appearance, food preparation, presentation and service, customer service standards, and cleanliness and sanitation. Under the Franchise Agreements, failure to comply with the health, sanitation, and safety standards constitutes a material default. *See* Franchise Agreements ¶ 9.A.2.

Pursuant to the franchise relationship, Dunkin has inspected the Homewood and Harvey shops without prior notice on numerous occasions. Since 1996, it has found multiple health, sanitation, and safety standards violations at the Homewood and Harvey shops. Indicated violations include: pests and evidence of pests; improper storage, refrigeration, and cooking temperatures; improper food and chemical storage; unsanitized utensils; faulty faucets; unclean floors, walls, countertops, toilets, and sinks; insufficient employee hygiene; ill-kept trash areas; and various documentation deficiencies. While some of these were cured by the time of the next inspection, many apparently were not.

In addition to Dunkin's own inspections, Michael Nemitz, the Health and Environment Coordinator for the Village of Homewood, also performed several inspections in accordance with the village's municipal health code. After various inspections in 1998 and 1999, Nemitz indicated that the Homewood shop received a "very low score," posed "a significant public health risk," and

was "generally [an] unclean establishment." Ñemitz Aff. ¶¶ 5,12. As a result of his inspections, the Homewood shop was closed down on three separate occasions in May, July, and October 1999. In his affidavit filed in support of Dunkin's present motion, Nemitz opines that based upon over 1,500 inspections of food establishments, he considers the Homewood shop "to be one of the most unsanitary food establishments that [he has] ever inspected." *Id.* ¶ 23.

After each substandard inspection Dunkin sent a notice of default and notice to cure. Based on the perceived failure to cure these violations over a substantial period of time, Dunkin sent Bhayani on September 14, 1999, a Supplemental Notice of Termination of both the Homewood and Harvey shop Franchise Agreements as well as the Homewood sublease.

In the face of Dunkin's attempts to terminate the Agreement and sublease, Bhayani has refused to cease operations at either store. He contends that the poor structural condition of the Homewood shop building caused the pest problem at that store. Bhayani Aff. ¶ 42. He maintains that he has taken reasonable steps in fighting pests, including monthly inspections by an exterminator. *Id.* ¶¶ 40, 43. He also asserts that although the manuals are difficult to read and understand, *id.* ¶ 46, he has properly trained his employees and managers and "made diligent

7

efforts to comply with all health and sanitation standards and promptly addressed any problems," *id.* ¶ 44.

Moreover, Bhayani believes that the inspections conducted by Dunkin "targeted only the problems and unfairly portrayed the overall condition of the shops." *Id.* ¶ 45. In response to the closing of his shop by the Village of Homewood on three separate occasions, Bhayani denies that the health and sanitation problems existed or justified closing the shop. *Id.* ¶ 140. Bhayani concludes that "[t]hroughout the relevant time period, [he] remained in reasonable compliance with reasonable health and sanitation standards and promptly cured any problems that arose." *Id.* ¶ 47.

## II. <u>ANALYSIS</u>

Summary judgment is appropriate when the pleadings, depositions, and other materials in the record demonstrate that there are no disputed facts and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The evidence and reasonable inferences drawn from such evidence is viewed in the light most favorable to the nonmovant. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). In order for defendants to overcome a motion for summary

judgment, they must put forth sufficient evidence to show there is a genuine issue of material fact requiring trial. *Id.; see also Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806 (7th Cir. 2000).

In Counts I-V, Dunkin asserts claims for breach of contract under the Franchise Agreements and sublease. Dunkin also asserts violation of § 32 of the Lanham Act, 15 U.S.C. § 1114, and § 43 of the Act, 15 U.S.C. § 1125. To prove a violation of § 32, Dunkin must establish that: (1) the marks are registered; (2) the marks were used in commerce by Bhanayi without Dunkin's consent; (3) the unauthorized use of the marks is likely to cause confusion, or mistake, or to deceive the public, within the meaning of § 32. *Burger King Corp. v. Mason*, 710 F.2d 1480, 1491 (11th Cir. 1983), *cert. denied*, 465 U.S. 1102 (1984). To prove a violation of § 43, Dunkin must show that: (1) Bhanayi used a term, name, symbol, or device in commerce; (2) in connection with goods, services, or container for goods; (3) which is likely to cause confusion, or mistake, or to deceive the public; (4) as to the affiliation, connection or association of Bahanyi with Dunkin. *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988).

## A. REGISTERED AND INCONTESTABLE MARKS

Dunkin registered its marks with the federal government in 1981. Such registration constitutes prima facie evidence of Dunkin's exclusive right to the marks in commerce. 15 U.S.C. §§ 1057(b), 1115(a). Dunkin has continuously used these marks in interstate commerce, and these marks are therefore "incontestable" under the Lanham Act. *Id.* §§ 1065, 1115(b); *see also Burger King Corp. v. Majeed*, 805 F. Supp. 994, 1002 (S.D. Fla. 1992). Further, paragraph 7.A.2 of the Franchise Agreements specifically forecloses Bhanayi from "directly or indirectly contest[ing] or aid[ing] in contesting the validity of ownership" of the marks.

## B. USE OF MARKS WITHOUT DUNKIN'S CONSENT

An element of § 32 is that the defendant use the marks in commerce without the owner's consent. Under § 43, the defendant must use the mark in commerce in such a way likely to cause confusion, or mistake, or to deceive the public. Where a franchisee materially defaults under a franchise agreement and that agreement is validly terminated–yet the franchisee continues to use the marks and trade name without the franchisor's consent–such continued use is unlawful under the Lanham Act. *See S&R Corp. v. Jiffy Lube Int'l Inc.*, 968 F.2d 371, 375-76 (3d Cir.

1992); *Burger King Corp. v. Lee*, 766 F. Supp. 1149, 1154-55 (S.D. Fla. 1991); *Dunkin' Donuts, Inc. v. Towns Family, Inc.*, No. 95-CV-3666, 1996 WL 328018, at *4 (N.D. Ill. June 11, 1996) (unpublished).

Under the clear language of the Franchise Agreements, failure to pay required fees or to maintain satisfactory health, sanitary, and safety standards constitutes material default. Franchise Agreements ¶¶ 9.A.2, 9.A.3. For failures to pay fees, the Agreements provide a franchisee with seven days to cure; for violations of sanitary, health, and safety standards, a franchisee has twenty-four hours to cure. *Id.* ¶¶ 9.B.1, 9.B.2. The time periods to cure do not begin to run until the franchisee is given written notice by Dunkin of the default. *Id.* ¶ 9.B. The sublease contains similar requirements. Sublease ¶ 14.

It is undisputed that Bhayani failed to pay certain franchise, advertising, and other fees owed to Dunkin in connection with the Homewood and Harvey shops. The record shows that he was provided sufficient written notice and time to cure under the Agreements. Bhayani failed to cure the default by paying the required fees to Dunkin. Accordingly, the Court finds that there exists no genuine issue of material fact on whether Bhayani materially defaulted under both the Homewood and Harvey Agreements for failure to pay required fees in a timely manner.

Bhayani has come forward with some evidence that he paid his rents under the Homewood sublease within the specified time frame. He has provided copies of deposited checks dated from October 1998 through February 1999. Each has a notation in the memo line indicating the payment is for rent and taxes. Accordingly, the Court finds that a genuine issue of material fact exists on this issue.

The record clearly shows that both shops, at one time or another, violated various health, sanitation, and safety standards of Dunkin, although Bhayani insists that any violations were minor. However, based on the voluminous records provided by Dunkin-including the reports of its own investigator as well as those of Nemitz-documenting serious health, sanitation, and safety violations at both the Homewood and Harvey shops, the Court finds that such violations caused both shops to fall below any reasonable standard of "sufficient sanitation, health, and safety standards" and constituted material breaches of the Franchise Agreements. Bhayani's conclusory statements that any violations were either not that bad or failed to justify good cause termination, and that both shops remained in *reasonable* compliance with *reasonable* standards, has no factual basis in the record nor any basis in the law.

Bhayani's material defaults are not sufficient alone, however, to terminate the Franchise Agreements and sublease. Dunkin must establish that it provided Bhanayi with sufficient written notice of such terminations. Franchise Agreements ¶ 9.D. On February 5, 1999, Dunkin sent two letters of termination to Bhayani, one each for the Homewood and Harvey shops. Besides the addresses and identification numbers, the letters are identical. They read in pertinent part:

> By letter dated January 11, 1999, which was served on you, you were given formal notice that you were in default under the terms and conditions on your Lease with regard to the Dunkin' Donuts franchised shop occupied by you at the above address (the "Notice of Default"). The Notice of Default also notified you that you had ten (10) days in which to cure your default under the Lease, and that if you did not do so, that Dunkin' Donuts might exercise its right to terminate the Lease, that the termination of the Lease would constitute a default under your Franchise Agreement with Dunkin' Donuts, and that Dunkin' Donuts may also elect to terminate your Franchise Agreement.

> You have failed to cure defaults set forth in the Notice of Default within the time permitted. Accordingly, please be advised that Dunkin' Donuts hereby terminates your Lease and your Franchise Agreement effective immediately.

Plaintiffs' Exh. 2.H, 2.I.

As explained above, there exists a genuine issue of material fact whether Bhayani made timely rent and tax payments under the Homewood sublease. Because the termination letter relies primarily on Bhayani's alleged failure to pay rents under the

sublease as grounds for termination of the sublease and the Homewood Franchise Agreement, it is not clear at this time whether the February 5, 1999, letter provided Bhayani with adequate notice of the proper grounds for terminating the Homewood Franchise Agreement and sublease.

Further, it is not clear whether the Harvey shop letter was sufficient to terminate that Franchise Agreement. If the second paragraph is read in isolation, it would appear to put Bhayani on notice that based on the January 1999 notice of default relating to the Harvey shop, his Franchise Agreement for that shop was being terminated. In that notice Dunkin clearly indicated that Bhayani was in default on the Harvey Franchise Agreement for failure to pay franchise and advertising fees.

Yet, when the second paragraph is read in conjunction with the first paragraph—which strictly relies on the failure to pay rents under a lease for termination—the notice makes little sense. Bhayani could not be in default for failure to pay rents on the Harvey shop building, given that he *owned* the building and therefore did not lease it.

Neither party has adequately addressed whether the February 5, 1999, termination letters adequately put Bhayani on notice that the Franchise Agreements were being terminated based on his failure to pay franchise and advertising fees in addition to his

14

alleged failure to pay timely rents and taxes under the sublease. Yet, the Court need not find here that the these letters validly terminated the Franchise Agreements and sublease as of February 5, 1999. Dunkin's second notice of termination sent on September 14, 1999, based on the various health, sanitation, and safety violations at both shops was sufficient. As explained above, such violations were material defaults of which Bhayani was provided adequate notice and time to cure. The written notice of termination clearly explained that the violations constituted additional and independent grounds for termination of both franchise agreements. Further, Dunkin elected to terminate the sublease based on its termination of the Homewood Franchise Agreement. Sublease ¶ 6.

Thus, it is clear that while the February 5, 1999, letters may not have provided Bhayani sufficient notice of the proper grounds for termination, the subsequent September 14, 1999, letter did effectively terminate both franchise agreements as well as the sublease. Accordingly, the Court finds that there is no genuine issue of material fact that Bhayani materially defaulted both Franchise Agreements and the sublease, and that both Agreements and the sublease were validly terminated by Dunkin in September 1999.

## C. LIKELIHOOD OF CONFUSION

There is a near certainty of confusion for purposes of § 32 of the Lanham Act when a terminated franchisee continues to use the marks and trade name of the franchisor. *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989); *Mason*, 710 F.2d at 1492-93. Such continued use also meets the "likelihood of confusion" standard of § 43(a). *See Jiffy Lube*, 968 F.2d at 375. Any consumer that enters into either the Homewood or Harvey shops would reasonably–but mistakenly–believe that the businesses were sponsored by, approved by, and otherwise affiliated with Dunkin. The Court finds that Dunkin has satisfied its burden of showing a likelihood of confusion for purposes of § 32 and § 43(a) of the Lanham Act.

Accordingly, Dunkin has established its prima facie case for violation of § 32 and § 45(a) of the Lanham Act as well as breach of contract under the Franchise Agreements and sublease. While Dunkin seeks damages in addition to declaratory and injunctive relief, the scope of relief granted here is limited to the latter two forms of relief. Further briefing is necessary on several issues related to the parties' claims for damages. *See infra* Part III.

## D. __BHAYANI'S AFFIRMATIVE DEFENSES AND COUNTERCLAIMS__

Bhayani asserts affirmative defenses and counterclaims, several of which are not relevant to Dunkin's claim for declaratory and injunctive relief and are therefore not addressed here. In his opposition brief, Bhayani maintains that any breaches of the Agreement by him—either financial breaches or health, sanitation, and safety violations—were directly caused by the bad faith actions of Dunkin. He specifically argues that Dunkin: (1) targeted him for his franchisee activism by classifying him as a "C" franchise and blocking his attempt to open a franchise in the Markham, Illinois, area; (2) failed to support the Branded Products Program, causing him financial losses of sunk investments and expected profits; and (3) failed to maintain the structural integrity of the Homewood building.

Bhayani argues that these acts caused him such financial distress that he was unable to pay the franchise fees and adequately maintain his shops. Given this, defendant contends that Dunkin materially breached the Agreements and sublease. Therefore, Dunkin's attempts to terminate were made in bad faith and should not be judicially recognized or enforced. Bhayani also maintains that based on Dunkin's material breaches, he should not be expected to perform fully under the Agreement, yet

he should still retain the right to use Dunkin's marks and trade name.

Even if Dunkin breached the Agreements and sublease, Bhayani's continued use of the marks and trade name is unlawful. Various courts have analyzed the effect of continued performance after a breach of a contract:

> A material breach does not automatically and ipso facto end a contract. It merely gives the injured party the right to end the agreement; the injured party can chose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

*Dunkin' Donuts of Am., Inc. v. Minerva, Inc.*, 956 F.2d 1566, 1571 (11th Cir. 1992) (quoting *Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (Ct. Cl. 1976)); *see also Kass v. Todd*, 284 N.E.2d 590, 593-94 (Mass. 1972) (builder who continued to perform and submit bills after owner's breach could not recover on quantum meruit).

In this case, assuming without deciding that Dunkin did breach the Franchise Agreements and sublease, Bhayani had a choice: he could either consider the contract terminated, and sue for total breach, or he could continue to perform under the

18

contract, and sue for partial breach. Given that Bhayani failed to make the required financial payments, he apparently chose to treat Dunkin's alleged actions as a complete breach of the Franchise Agreements. Accordingly, he did not have the contractual right to continue to use the marks and trade name of Dunkin and retain the benefits of the Agreements without also incurring the costs. *See, e.g.*, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1308 (11th Cir. 1998) (relying on *Jiffy Lube* and finding that once the franchisor shows that the franchise was validly terminated, the franchisee could be enjoined from further use of trademarks); *Original Gr. Am. Choc. Chip Cookie Co., Inc. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 282 (7th Cir. 1992) (granting franchisor injunctive relief for franchisee's continued unauthorized use of trademarks and name after material breach); *Jiffy Lube*, 968 F.2d at 375 ("Once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act."); *Lee*, 766 F. Supp. at 1157 ("Simply put, a terminated franchisee has no right to continue to hold itself out as an authorized franchisee and enjoy its benefits."). Although Bhayani may be successful on his breach of contract claims and other claims for damages–thereby excusing his failure to pay some or all of his fees and rents–this does not excuse his *own* decision to breach the Agreements by using the

19

marks and trade name of Dunkin without also paying for their usage.[2]

Moreover, assuming, *arguendo*, that Dunkin in fact terminated the Franchise Agreements because, for example, it did not care for Bhayani's activism on behalf of franchisees, Bhayani's material breaches were sufficient to justify termination. As long as sufficient cause existed for termination, "it does not matter whether [plaintiff] also possessed an ulterior, improper motive for terminating the [defendant's] franchise agreement." *Robertson*, 147 F.3d at 1309 (citing *Original Great Am.*, 970 F.2d at 279 ("The fact that the Cookie Company may . . . have treated other franchisees more leniently is no more a defense to a breach of contract than laxity in enforcing the speed limit is a defense

---

[2]

Defense counsel cites *Milsen Co. v. Southland Corp.*, 454 F.2d 363 (7th Cir. 1971) in response to Dunkin's request for injunctive relief. In that case the Seventh Circuit preliminary enjoined the franchisor from terminating the franchise prior to trial. The case is distinguishable, however, from the present action.

The franchisees in *Milsen* had brought credible antitrust claims against the franchisor. Under such circumstances, the court found it appropriate to enjoin the franchisor from using its alleged market power to terminate its franchisees and thereby crippling them from continuing to pursue their antitrust claims. The court found that the public interest in encouraging private antitrust actions outweighed the private contractual interests of the franchisor in terminating the franchises. In the present case, however, defendants have not filed antitrust claims against Dunkin, nor are there credible allegations of abuses of market power.

to a speeding ticket. . . . Liability for breach of contract is strict.")).

Equally tenuous is Bhayani's argument that Dunkin's alleged bad faith actions directly *caused* him to breach and thereby excuses him from performing. Under both Massachusetts and Illinois law,[3] there is an implied covenant of good faith in commercial contacts. *Minerva, Inc.*, 956 F.2d at 1569-70 (applying Massachusetts law and citing *Zapatha v. Dairy Mart, Inc.*, 408 N.E.2d 1370, 1378 n.15 (Mass. 1980)); *Industrial Specialty Chems., Inc. v. Cummins Engine Co., Inc.*, 902 F. Supp. 805, 811 (N.D. Ill. 1995) (applying Illinois law). As noted by the Seventh Circuit, however, this implied covenant does not require that a party act "reasonably" in its relations with a contracting party. *Original Great Am.*, 970 F.2d at 280. Rather, good faith requires a party "to avoid taking advantage of gaps in a contract in order to exploit the vulnerabilities that arise when contractual performance is sequential rather than simultaneous." *Id.* (citing *Market St. Assocs. Ltd. Partnership v. Frey*, 941 F.2d 588, 593-96 (7th Cir. 1991)). The court explained that in the

_____

3

 Both Franchise Agreements have a choice of law provision providing that Massachusetts law applies to disputes between the franchisor and franchisee. As noted by an addendum to the Harvey Franchise Agreement, however, section 4 of the Illinois Franchise Disclosure Act of 1987 states that a forum designation clause is void with respect to any cause of action which otherwise is enforceable in Illinois.

franchisor-franchisee context, bad faith could be shown, for example, where the franchisee builds up an exceptional franchise and the franchisor attempts to appropriate the value by canceling the franchise on a pretext (e.g., three or four "utterly trivial violations"). *Id.*

In this case, Bhayani has not shown that his franchises were "exceptional" nor that they were terminated based on some sort of "pretext." Bhayani's failure to make timely franchise and advertising payments and the multiple health, sanitation, and safety violations were material breaches of the Agreements. Similar violations have been found by courts as valid grounds for terminating franchise agreements. *See Robertson*, 147 F.3d at 1309; *Original Great Am.*, 970 F.2d at 280.

At the September 19, 2000, hearing, defense counsel directed the Court to a recent case by the Seventh Circuit, *Interim Health Care of N. Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876 (7th Cir. 2000). The plaintiff-franchisee in *Interim Health Care* operated a franchise which provided medical service in patients' homes. Defendant-franchisor advised plaintiff that her franchise was being terminated because she was in default on royalty payments. Plaintiff brought suit against the franchisor for, *inter alia*, breach of contract and breach of the implied duty of good faith. She argued that the franchisor had withheld

22

business leads it was contractually required to give her; failed to advise her of the repercussions of bad performance; and impermissibly encroached into her territory.

The Seventh Circuit held that genuine issues of material fact existed as to whether the franchisor's actions were made in bad faith and effectively caused the breach. "This seems the paradigmatic case of a contract party invoking a reasonable contract term (the discretionary obligation to furnish account leads) dishonestly to achieve a purpose 'contrary to that for which the contract had been made.'" *Id.* at 886 (quoting *Original Great Am.*, 970 F.2d at 280).

Assuming without deciding here that Dunkin's alleged actions or inactions (1) made it difficult for Bhayani to control pests in the Homewood shop; (2) made it difficult for Bhayani to stay current on his financial payments; (3) directly or indirectly resulted in some of the health, sanitation, and safety violations at the Homewood shop; and (4) were made in bad faith, Bhayani's continued use of Dunkin's marks and trade name is still unlawful. There were multiple violations of health, sanitation, and safety standards at both shops that *were not* related to pests or to the structural integrity of the building. These include: improperly stored and cooked food and chemicals; unsanitized utensils; failure to clean and maintain toilets, sinks, walls, floors, and

23

countertops; use of unauthorized cleaning products; ill-kept trash areas; failure to store wiping clothes in sanitizing solution; and failure to maintain proper health and safety documentation. There is no indication that Bhayani could not afford to cure these basic health and safety violations, nor were these violations difficult to understand. Such basic violations of reasonable health and safety standards were sufficient alone to terminate the Agreements, which Dunkin did by its written notice of September 14, 1999. Any continued use of Dunkin's marks and trade name would be "unauthorized" and therefore unlawful.

### III. <u>CONCLUSION</u>

For the reasons stated above, plaintiffs' motion for summary judgment on their claims is **GRANTED IN PART**. An order for declaratory and injunctive relief on plaintiffs' claims shall issue forthwith. Injunctive relief shall be limited, however, to enjoining defendants' continued use of Dunkin' Donuts proprietary trade and service marks and trade name. At this time, the Court is not prepared to order that defendants quit the Homewood premises. While Dunkin validly terminated the sublease as of September 1999, whether Bhayani retains some non-contractual rights in the premises under Illinois or municipal law has not

been adequately addressed by the parties. Accordingly, a briefing schedule shall issue forthwith asking the parties to state their positions on this question as well as whether the February 5, 1999, notices were sufficient to terminate either of the Agreements or sublease and an updated calculation of the their respective demands for damages.

Dated: December <u>1</u>, 2000

<u>/David W. McKeague/</u>
DAVID W. McKEAGUE
UNITED STATES DISTRICT JUDGE